**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Trifocal LLC, | NO. C 03-05413 JW |
| Plaintiff, | |
| v. | **POST-TRIAL ORDER RE: APPLICABILITY OF INDEPENDENT WHOLESALE SALES REPRESENTATIVE ACT** |
| E-centives, Inc., | |
| Defendant. | |
| _____ / | |

## I.  INTRODUCTION

Plaintiff Trifocal, a limited liability company, filed this lawsuit against Defendant E-centives, Inc., claiming that E-centives owed it commissions and fees for services rendered pursuant to a written contract between the two companies.  The parties waived their right to a jury trial.  The case was tried to the Court sitting without a jury.

At the conclusion of the trial, the Court stated its findings of fact and conclusions of law on the record.  The Court found that E-centive owed Trifocal $50,937.50 for services rendered with respect to two claims: First, E-centives owed Trifocal a base fee of $20,000 for management services in connection with a program called the "On-line Acquisition Program."  Secondly, the Court found that E-centive owed Trifocal a commission of $30,937.50  for the renewal of a contract between E-centives and Nestle.

United States District Court

For the Northern District of California

1    The Court directed the parties to submit post-trial briefs on the issue of the amount of interest

2    which was due under the Court's findings.  In addition, the Court directed the parties to brief

3    whether the contract between Trifocal and E-centives was covered by the Independent Wholesale

4    Sales Representative Act (the "Act") and, if so, what relief should be awarded pursuant to the Act.

5

6    The post-trial briefs were filed and the case submitted for decision.  This Order sets forth the

7    Court's findings with respect to these post-trial matters.  A separate final judgment is entered

8    accordingly.

9                                    **II.  BACKGROUND**

10    Trifocal, LLC. is owned by an individual named Scott Wills.  Before his formation of

11    Trifocal, Wills was the Chief Executive Officer of a corporation named Bright Street.com, Inc., a

12    company engaged in internet advertising.

13    In December of 2001, E-centives, Inc., acquired substantially all of the assets of Bright

14    Street.com, Inc.  Following the acquisition, E-centives hired a number of Bright Street employees,

15    including Scott Wills who became a Senior Vice President of E-centives.

16    In his role as a Senior Vice President, Wills was assigned a number of tasks designed to

17    integrate the two companies and to market their combined services to existing and new customers.

18    One of Wills' assignments was a consumer tracking program for one of E-centives' customers called

19    the On-Line Acquisition Program.

20    Toward the end of March 2002, Wills gave notice to E-centives' CEO, Kamran Amjadi, that

21    he intended to terminate his employment with E-centives.  At the time of Wills' resignation  notice,

22    E-centives was in the midst of a vigorous campaign to renew several contracts with its existing

23    customers and to perfect the On-Line Acquisition Program.  Because Wills was providing

24    importance assistance with some of the contract negotiations and was the manager of the On-Line

25    Acquisition Program, Amjadi and Wills discussed various proposals under which Wills might

26    continue to assist E-centives, despite termination of his employment.  Eventually, Wills and Amjadi

27

28                                          2

United States District Court

For the Northern District of California

1  agreed that Wills would provide his services to E-centives as an independent contractor.  Wills

2  terminated his employment with E-centives and created a Trifocal, LLC.

3        Effective May 1, 2002, Trifocal and E-centives entered into a contract entitled "Binding

4  Letter of Agreement."  In the Binding Letter of Agreement, the parties expressed their intention to

5  have the Letter of Agreement govern their relationship until they developed and signed a "more

6  definitive" contract on terms "mutually agreed to."  They were never able to reach a more definitive

7  agreement.  Consequently, the Binding Letter of Agreement became the operative contract.

8        Under the terms of the Binding Letter of Agreement, Trifocal agreed to act as an independent

9  sales representative for listed "Named Target Accounts," and for any "new accounts" which might

10  be approved by Amjadi.  Among the listed "Named Target Accounts" were "all Nestle divisions and

11  corporate."  As compensation for its acting as an independent sales representative E-centives agreed

12  to pay Trifocal a "Primary Commission."

13        Eventually the Nestle Division renewed its account.  Trifocal claimed a commission for the

14  renewal.  E-centives refused to pay it on the ground that Trifocal had concealed that Nestle had

15  actually signed the renewal prior to the effective date of the Binding Letter of Agreement.  After

16  hearing evidence with respect to the terms of the Binding Letter of Agreement and the circumstances

17  of the Nestle renewal, the Court found that E-centives owed a commission to Trifocal for the Nestle

18  renewal.

19        Apart from acting as an independent sales representative, under the terms of the Binding

20  Letter of Agreement, Trifocal also agreed to provide other services such as providing information

21  concerning Bright Street, conducting sales seminars, reviewing marketing material.  Eventually,

22  Amjadi requested Wills through Trifocal to assist in the management of the On-Line Acquisition

23  Program.  Specifically, on May 13, 2002, on behalf of E-centives, Amjadi gave his written approval

24  to an e-mail proposal by Trifocal to manage the On Line Acquisition Program for a fee of $100,000.

25  The fee was payable $50,000 "not performance contingent," and $60,000 as a "bonus" contingent on

26  the program's success in enrolling a prescribed number of consumers.  Only $30,000 of the non-

27

28                                                      3

1 performance contingent fee was paid.  The Binding Letter of Agreement was terminated before any

2 bonus payment was earned.  At the conclusion of the trial, the Court found that E-centives owed

3 Trifocal the $20,000 balance on the non-performance contingent fee.  The Court asked the parties to

4 submit post-trial briefs on any interest due on the $20,000 balance.

5      Trifocal's Complaint included a claim for treble damages under the California Independent

6 Wholesale Sales Representatives Act.  After announcing its factual findings, the Court directed the

7 parties to submit post-trial briefs on the applicability of the Act and any remedy which should be

8 awarded.

9                                **III.  DISCUSSION**

10 **A.     Interest is recoverable by Trifocal for E-centives' failure to pay it for services rendered
           in managing the On-Line Acquisition Program.**

11

12      The Court has found that E-centive owes Trifocal a balance of $20,000 for its services in

13 managing the On-Line Acquisition Program.  The $20,000 base fee was due on July 1, 2002.  The

14 Binding Letter of Agreement provides that a late payment will incur a 1½% monthly late charge.

15 The Court accepts Trifocal's calculation of the late fee and finds that Trifocal in entitled to the

16 additional sum of $13,364.28 as of March 17, 2006, the date the Court made its ruling from the

17 bench.

18      Trifocal contends that the Independent Wholesale Sales Representatives Act applies to the

19 On-Line Acquisition Program fee.  For reasons discussed more fully below, the Court holds that the

20 Act is not applicable to this fee.  The agreement between Trifocal and E-centive with respect to the

21 On-Line Acquisition program was a fee for service contract.  It did not involve the payment of a

22 commission and therefore is not covered by the Independent Wholesale Sales Representative Act.

23 **B.     Interest is recoverable by Trifocal for the unpaid commission on Nestle renewal.**

24      The Court accepts Trifocal's calculation of principal and interest due on the Nestle

25 commission.  Trifocal is entitled to payment of the principal sum of $30,937.50, plus interest in the

26 sum of $19,115.25, for a total of $50,052.74.

27

28                                        4

**C.     The Independent Wholesale Sales Representative Act does not apply to the Nestle's Commission Claim.**

In addition to its commissions, Trifocal claims that it is entitled to treble damages pursuant to the California Independent Wholesale Sales Representatives Contractual Relations Act of 1990.

Section 1738.15 of the Act provides:

> A manufacturer, jobber or distributor who willfully fails to enter into a written contract as required by the chapter or willfully fails to pay commissions as provided in the written contract shall be liable to the sales representative in a civil action for treble damages proved at trial.

Cal. Civil Code §1738.15.

The Act is not applicable to every contract between an independent sales representative and a manufacturer or distributor.  To be covered, the independent sales representative must be a "wholesale sales representative."  Thus, the applicability of the Act to the Binding Letter of Agreement depends upon whether or not Trifocal was acting as a "wholesale sales representative," for a "manufacturer" as those terms are defined in the Act.

A fundamental principle of statutory interpretation is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.  People ex rel. Younger v. Superior Court, 16 Cal.3d 30, 40 (1976).  In determining legislative intent, the Court turns first to the words used in the statute.  People v. Knowles, 35 Cal.2d 175, 182 (1950).  The words of the statute must be read in context, keeping in mind the nature and obvious purpose of the statute where they appear.  Tripp v. Swoap, 17 Cal.3d 671, 679 (1976).  The statutory language must be given such interpretation as will promote rather than defeat the objective of the law.  Steilberg v. Lackner, 69 Cal.App.3d 780, 785 (1977).  In addition, in ascertaining legislative intent, the Court should take into account other matters as well, such as the legislative history, public policy, and any contemporaneous administrative construction.  English v. County of Alameda, 70 Cal.App.3d 226, 233- 234 (1977).

In interpreting the Independent Wholesale Sales Representatives Act, the Court is aided by specific declaration of legislative intent in §1738.10 and definitions in §1738.12.

//

5

1      A "wholesale sales representative" is defined as:

2      [A]ny person who contracts with a manufacturer . . . or distributor for the purpose of
       soliciting wholesale orders [and who is] compensated, in whole or part, by
3      commission.

4    Cal.  Civ.  Code §1738.12(e).

5      The term "wholesale orders" is not defined in the Act.  However, the term is a commonly

6    used commercial term which is defined in other California statutes and has a commonly understood

7    meaning.  For example, in the California Food and Agriculture Code, a "wholesale customer" is

8    defined as **one who purchases a product for resale to consumers** or to other wholesale customers.

9    See Cal.  Food & Agric. Code §61839.  A similar commercial definition was adopted in a municipal

10   tax ordinance under review in Times Mirror Co.  v.  City of Los Angeles, 192 Cal.App.3d 170

11   (1987).  The court in Times Mirror noted:

12      For purposes of this section, a wholesale sale or sale at wholesale means **a sale of
        goods**, wares or merchandise **for the purpose of resale** in the regular course of
13      business.

14   192 Cal.  App.3d at 176 fn.  4.

15     In its review of cases and materials in the area of commercial law in the State of California

16   and generally, the Court notes that the term "wholesale" consistently means a sale of a product by

17   one merchant to another merchant.  It is consistently used to refer to a distribution method in which

18   the merchant-to-merchant sale is ultimately followed by a merchant to consumer sale of the product.

19     Although the Act does not separately define the term"wholesale," the other defined terms

20   clearly call for a wholesale-retail distribution of products.  For example, the Act defines the term

21   "manufacturer" as:

22      [A]ny organization engaged in the business of producing, assembling . . .or by any
        other method of fabrication, **a product** tangible or intangible, **intended for resale to,**
23      **or use by the consumers of this state**.

24   Cal. Civil Code §1738.12(a).

25     Applying these definitions and interpretations to the Binding Letter of Agreement leads the

26   Court to conclude that the commission owed to Trifocal for Nestle's renewal of its contract with E-

27   centive is not a commission for wholesale of a product for purposes of retail sales to consumers.

28
                                         6

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    The evidence established that E-centives is in the business of providing interactive marketing

2    technologies and services to companies who market consumer products on the Internet.  Using its

3    technologies, Nestle and other customers of E-centives are able to market their products to

4    consumers using consumer e-mail accounts.  Nestle uses E-centive technology to publish interactive

5    discount coupons, conduct on-line surveys, and engage in other interactive product promotions.  As

6    consumers respond to Nestle's promotions, the E-centive suite of products allow Nestle to capture

7    consumer information, compile reports on the responsiveness of consumers to various campaigns

8    and otherwise manage customer relations.  In no ordinary sense of the term is Nestle engaged in

9    retail sales or use of the E-centive product even though the Nestle web site is being used by

10   consumers.

11       Trifocal asks the Court to include the E-centive contract with Nestle under the Act because

12   Nestle makes consumer product.  However, the consumer products made by Nestles and sold retail

13   by Nestle are not sold to Nestle by E-centive.  Moreover, the use of coupons generated by Nestle

14   using the E-centive programs and technologies, does not bring the consumer into a

15   manufacturer/wholesale/retailer relationship with E-centives.

16       The Act specifically exempts sales representatives who earn a commission for sales to a

17   customer which uses the product for its own benefit:

18       "Wholesale sales representative" . . .shall not include one who sells or takes orders
         for the direct sale of products to the ultimate consumer.

19   Cal. Civil Code §1738.12(e).

20

21   Although the Court doubts the Act was intended to cover the marketing services provided by E-

22   centives to Nestle, even if the Court were to consider that E-centives services and licences are

23   products under Act, the Act still would not apply because the product manufactured by E-centives is

24   used by Nestle.  In that sense, Nestle is the consumer of E-centives products and Trifocal earns a

25   commission for direct sales to the ultimate consumer.

26       Accordingly, the Court finds that the Act does not apply to the Binding Letter of Agreement

27   between Trifocal and E-centives.

28
                                                    7

**IV.  CONCLUSION**

Judgment shall be entered awarding to Trifocal principal and interest in accordance with this Order.  No award shall be made under the Wholesale Sales Representatives Act.


Dated:  April 19, 2006

JAMES WARE
United States District Judge

8

**United States District Court**
For the Northern District of California

1

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2  Frank R.  Ubhaus fru@berliner.com
   James W.  Lucey jlucey@carr-ferrell.com
3  John F.  Domingue jfd_esq@yahoo.com

4

**Dated:  April 19, 2006**                              **Richard W. Wieking, Clerk**

5

                                                         **By:    /s/ JW Chambers**
6                                                              **Melissa Peralta**
                                                               **Courtroom Deputy**
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28